**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF WISCONSIN**

---

LARNELL WASHINGTON,

Plaintiff,

v. Case No. 24-C-290

CITY OF MILWAUKEE, KATHERINE
HEIN SPANO, and GILBERT HERNANDEZ,

Defendants.

---

**CITY DEFENDANTS' RESPONSE TO PLAINTIFF'S**
**STATEMENT OF ADDITIONAL FACT**

---

NOW COME Defendants City of Milwaukee, Katherine Hein Spano, And Gilbert Hernandez (collectively, the City Defendants), by their attorney, Evan C. Goyke, City Attorney, represented by Assistant City Attorney Clint B. Muche, pursuant to Fed. R. Civ. P. 56 and Civil L.R. 56, in response to Plaintiff's statement of additional facts (ECF No. 47):

1. Annette Love was killed by two bullets from a .22 caliber Magnum firearm. (Plaintiff's Exhibit 1 at 14).

**RESPONSE:** Object as a duplication of the parties' Joint Statement of Undisputed Facts ("JSF") No. 1. *See* ECF No. 30, ¶ 1; Civil L. R. 56(b)(2)(B)(ii) ("*additional facts*") (emphasis added).

2. The pathologist who performed the autopsy did not note any wounds on Love's hands. (Plaintiff's Exhibit 1 at 21).

**RESPONSE:** Undisputed.

3. The Milwaukee police department documented its initial investigation in police reports dated July 26, 1990 through February 12, 1991. (Plaintiff's Exhibit 2).

**RESPONSE:** Undisputed.

4. The investigation began with interviews of persons who lived in the area where Love's body had been discovered. (Plaintiff's Exhibit 2 at 3-16).

**RESPONSE:** Object as irrelevant to the legal issues presented at summary judgment; notwithstanding that objection and subject to it, the City Defendants do not dispute the factual content of this paragraph.

5. One neighbor told the police that she heard two gunshots at about midnight, looked out her window and saw a black male walking northbound. (Plaintiff's Exhibit 2 at 3-4).

**RESPONSE:** Object as irrelevant to the legal issues presented at summary judgment; notwithstanding that objection and subject to it, the City Defendants do not dispute the factual content of this paragraph.

6. Another told the police that he heard two to three gunshots between 1:00 a.m. and 2:00 a.m. (Plaintiff's Exhibit 2 at 5).

**RESPONSE:** Object as irrelevant to the legal issues presented at summary judgment; notwithstanding that objection and subject to it, the City Defendants do not dispute the factual content of this paragraph.

7. A third neighbor said he had heard two "boom or shots" between midnight and 1:00 a.m. (*Id*.).

**RESPONSE:** Object as irrelevant to the legal issues presented at summary judgment; notwithstanding that objection and subject to it, the City Defendants do not dispute the factual content of this paragraph.

8. A fourth related that she had heard what she thought were fireworks at about 10:00 p.m. (Plaintiff's Exhibit 2 at 6-7).

**RESPONSE:** Object as irrelevant to the legal issues presented at summary judgment; notwithstanding that objection and subject to it, the City Defendants do not dispute the factual content of this paragraph. As further response, Defendants affirmatively assert and aver that the evidentiary record precludes a plausible inference that Love was shot prior to 12:15 a.m. *See* Plaintiff's Statement of Additional Fact ("PSAF"), ¶ 13.

9. A fifth neighbor told the police she heard arguing between male and female voices between 2:00 a.m. and 2:30 a.m. and then what sounded like gunshots and a louder "boom." (Plaintiff's Exhibit 2 at 12).

**RESPONSE:** Object as irrelevant to the legal issues presented at summary judgment; notwithstanding that objection and subject to it, the City Defendants do not dispute the factual content of this paragraph.

10. A sixth told the police she had heard gunshots and then saw three Black males in front of her building. (Plaintiff's Exhibit 2 at 13).

**RESPONSE:** Undisputed.

11. Love's sister and other family members told police that Annette had left her home at around 11:00 p.m. to go to the A&M Lounge. (Plaintiff's Exhibit 2 at 29-31).

**RESPONSE:** Object and deny that the propositions in this paragraph are supported by the materials cited. *See* ECF No. 47-2, 29 ("She states that she (Mary [i.e., Love's sister]) had not been there but had been told … that Annette had left at 11:00PM[.]"). *See also* Civil L. R. 56(b)(2)(B)(ii). Object as irrelevant to the legal issues presented at summary judgment; the only legal question presented is whether probable cause existed to arrest and detain Plaintiff pending trial from February 2023 until October 2023. On this evidentiary record, when Love left her home has no tendency to make the existence or nonexistence of probable cause more (or less) likely. Notwithstanding that objection and subject to it, the City Defendants state that the text of this report speaks for itself and deny anything beyond the written text of that report.

12. The family members, including Detra Love, a daughter of the victim, told the police that "they have no idea who might have done this to her." (Plaintiff's Exhibit 2 at 31).

**RESPONSE:** The City Defendants do not dispute that Detective Ardis interviewed Love's minor family members, including Detra, at 3:20 a.m. on July 17, 1990 and wrote "they have no idea who might have done this to her" as well as "I respectfully request that the day shift return … and re-interview them regarding [Love's activities], due to the fact that they were very upset upon learning

about the death of their mother/aunt in the early morning hours of this particular interview." (ECF No. 47-2, 31).

13. The police then talked to persons who had been at the lounge and learned that Love had left the lounge between 12:15 a.m. and 12:30 a.m. with "Larry." (Plaintiff's Exhibit 2 at 50-51, 60).

**RESPONSE:** Object and deny that the propositions in this paragraph are necessarily supported by the materials cited. *See* ECF No. 47-2, 50-51, 60. As further answer, the City Defendants admit that RET Lounge employees Crystal McNealy and Jerry Robinson told Detective Ardis that Love left with "Larry" around 12:15-12:30 a.m. and that another witness (Edward McNealey) told Detective Koszuta that Love left at approximately midnight. *Id.*

14. Other witnesses told the police that they had seen Love and "Larry" walking across the railroad tracks toward a fenced area. (Plaintiff's Exhibit 2 at 59).

**RESPONSE:** The City Defendants admit only that Crystal McNealy told Detective Koszuta that "when [Love] left with 'Larry', (*sic*) she observed them walking west on W. Townsend … and [that] she observed the two of them, the victim and Larry, walking west on Townsend across the railroad tracks and last observed them walking near a fenced in area." (ECF No. 47-2, 59).

15. On July 25, 1990, officers interviewed Ronald Brelove. (Plaintiff's Exhibit 2 at 66).

**RESPONSE:** Undisputed.

16. Brelove told the officers that Freddy Weaver and Glen "Cigar" Allen were involved in Love's homicide. (Plaintiff's Exhibit 2 at 66).

**RESPONSE:** The City Defendants admit the factual propositions in this paragraph. As further answer, the City Defendants affirmatively assert that both the criminal complaint (ECF No. 29-2, 6) and Detective Keller's preliminary hearing testimony emphasized that Brelove had told

different stories at different times. *See* ECF No. 29-8, 20:4-9,[1] 34:25-35:9,[2] and 39:5-8.[3]

17. The police received and investigated several anonymous leads. (Plaintiff's Exhibit 2 at 93-97).

**RESPONSE:** Undisputed.

18. In 1996, the police received a statement from Antonio Collins that Brelove had confessed to killing Love: Collins recounted Brelove saying he knew Love through a prison-connected Vice Lord "chief," believed she was lying and being disrespectful, intended to have sex with her, and then kill her. (Plaintiff's Exhibit 2 at 98-100).

**RESPONSE:** Object and deny that the propositions in this paragraph are necessarily supported by the materials cited. *See* ECF No. 47-2, 98-100. As further answer, admit that Detective Moore wrote a report in 1994 summarizing an interview with Antonio Collins in which "Collins stated Brelove had basically admitted to him (Collins) that he had done it[,]" and told the detectives a story similar to the factual propositions in this paragraph. *Id.* The City Defendants admit the text of that written report, which speaks for itself, and deny anything inconsistent with it.

19. The Milwaukee police department sent evidence to the Wisconsin Regional Crime Lab on July 30, 1990, which included fingernail clippings, human hair from Love's hands, and Love's clothing. (ECF No. 29-5, Joint Exhibit 5 at 7).

**RESPONSE:** Object as a duplication of the parties' JSF No. 3. *See* ECF No. 30, ¶ 3; Civil L. R. 56(b)(2)(B)(ii) ("*additional facts*") (emphasis added).

---

[1] "Q. Okay. Additionally, now, Brelove was interviewed a number of times over the years, correct?
A. Correct.
Q. And he has made – admittedly, he has made inconsistent statements about this matter, right?
A. Correct."

[2] "Q. Okay. But Brelove said that Cigar and FW went into the alley right?
A. Back in 1990, yes.
Q. Okay. Brelove in fact then later said it wasn't those two, but Cigar and Mr. Washington, right?
A. Correct.
Q. So Brelove, whose DNA was found on vaginal swabs of Ms. Love, in fact has never admitted to his own obvious involvement in this crime?
A. Correct."

[3] "Q. Okay. And again, Brelove has given several different statements, some of which are self-serving; is that fair to say?
A. Yes."

20. The Crime Lab found "[n]othing of apparent evidential significance" on the fingernail clippings. (ECF No. 29-5, Joint Exhibit 5 at 7).

**RESPONSE:** The City Defendants admit the above-quoted text appears in a crime lab report dated March 29, 1991, *see* ECF No. 29-5, 6-8, and affirmatively assert that that both the criminal complaint (ECF No. 29-2, 4) and the preliminary hearing testimony highlighted that DNA technology has improved substantially since 1990 and that the physical evidence related to Love's homicide has been tested and re-tested multiple times. *See* ECF No. 29-8, 15:15-17:17.

21. In 2009, defendant Hernandez became involved in the investigation and requested that the crime lab compare the DNA taken from Love to that of five specific persons. (ECF No. 29-14, Joint Exhibit 14 at 3).

**RESPONSE:** Undisputed.

22. Plaintiff was not among those persons. (ECF No. 29-14, Joint Exhibit 14 at 3).

**RESPONSE:** The City Defendants do not dispute the factual proposition in this paragraph, and affirmatively assert that in 2009 Detective Hernandez resubmitted physical evidence and DNA samples collected during the course of the initial investigation into Love's murder in 1990-91. (ECF. No. 29-3).

23. The Crime Lab reported in 2009 that it found "an insufficient amount of male DNA for further testing on the right hand fingernail clipping swab, item J1" (ECF No. 29-14, Joint Exhibit 14 at 3).

**RESPONSE:** Undisputed.

24. On December 11, 2009, the crime lab notified the Milwaukee police department of a "national level DNA Database Hit" between plaintiff and the left hand fingernail clippings. (JSF ¶ 45; ECF No. 29-15, Joint Exhibit 15).

**RESPONSE:** Undisputed.

25. The lab described the match as "an investigative lead." (ECF No. 29-14, Joint Exhibit 15 at 2).

**RESPONSE:** The factual proposition in this paragraph is undisputed. As further answer, by report dated December 17, 2009, the state crime lab advised, "[t]his DNA Databank match should be

considered an investigative lead. Identical siblings share all genetic information, including STR DNA profiles. For confirmation purposes it will be necessary to submit a DNA standard sample from Larnell Washington to the Wisconsin State Crime Laboratory in Milwaukee for comparison to the evidentiary DNA profile(s) developed in this case." (ECF No. 29-15, 3).

26. Spano took "very thorough notes" while interviewing witnesses. (ECF No. 29-10, Joint Exhibit 10, Spano Dep. 40:3).

**RESPONSE:** Undisputed.

27. Spano destroyed these notes when she entered her report into the police department's computer system. (ECF No. 29-10, Joint Exhibit 10, Spano Dep. 10:5-10).

**RESPONSE:** The City Defendants admit only that Detective Spano disposed of her handwritten notes after creating formal written reports, and object and deny to the extent this paragraph suggests or implies her notes necessarily were "destroyed" contemporaneous to the creation of her formal written reports. (ECF No. 29-10 ("Spano Dep."), 24:17-25:2).

28. Spano and Hernandez documented their work in the investigation into the death of Annette Love in police reports dated October 19, 2010 through January 30, 2012. (Plaintiff's Exhibit 3 at 3-91).

**RESPONSE:** Undisputed.

29. The "Reported Date" on these police reports is inserted automatically by the police department's report system. (ECF No. 29-10, Joint Exhibit 10, Spano Dep. 39:15-17).

**RESPONSE:** Undisputed.

30. Spano and Hernandez interviewed Larry Pollard on May 22, 2011. (Plaintiff's Exhibit 3 at 57). Spano did not file her report until July 24, 2011. (*Id.*).

**RESPONSE:** Object and deny that all the propositions in this paragraph are supported by the materials cited. *See* ECF No. 47-4, 57. As further answer, the City Defendants do not dispute that Detective Spano wrote a report dated July 24, 2011, about photo identifications made by Larry Pollard in the presence of Detectives Spano and Hernandez on May 12, 2011, wherein he positively identified two individuals known to him by nickname only who told him Brelove was involved in

Love's murder. *Id.* Spano testified that the "Reported Date" field was automatically populated by MPD's computer record-keeping system when creating a new report. (ECF No. 29-10 ("Spano Dep."), 20:18-21:17, 30:5-30:14, 35:14-20, 37:14-39:17, 45:23-46:12, 53:6-55:16). In at least one instance, the "Reported Date" populated by the system predates the interview date referenced in the report narrative. (ECF No. 47-3, 25). The record does not establish when Spano's report was filed.

31. Spano and Hernandez interviewed Willie L. Robinson on July 10, 2011. (Plaintiff's Exhibit 3 at 58). Spano did not file her report until July 24, 2011. (*Id.*).

**RESPONSE:** Object and deny that all the propositions in this paragraph are supported by the materials cited. *See* ECF No. 47-3, 58-59. As further answer, the City Defendants do not dispute that Detective Spano wrote a report, dated July 24, 2011, detailing attempts to locate Willie L. Robinson on June 10, 2011, and a phone interview with him on June 16, 2011. *Id.* The record does not establish when Spano's report was filed. *See* ¶ 30, *supra*.

32. Spano and Hernandez interviewed Bobby Watkins on June 30, 2011. (Plaintiff's Exhibit 3 at 60). Spano did not file her report until July 24, 2011. (*Id.*).

**RESPONSE:** The City Defendants do not dispute that Detective Spano summarized a telephone interview with Watkins on June 30, 2011 in a report dated July 24, 2011. (ECF No. 47-3, 60-61). The record does not establish when Spano's report was filed. *See* ¶ 30, *supra*.

33. Spano interviewed Maceo Downer on July 5, 2011. (Plaintiff's Exhibit 3 at 62). Spano did not file her report until July 24, 2011. (*Id.*).

**RESPONSE:** The City Defendants do not dispute that Detective Spano summarized a telephone interview with Downer on July 5, 2011 in a report dated July 24, 2011. (ECF No. 47-3, 62-63). The record does not establish when Spano's report was filed. *See* ¶ 30, *supra*.

34. Spano interviewed Malcolm Norfleet on July 11, 2011. (Plaintiff's Exhibit 3 at 64). Spano did not file her report until July 24, 2011. (*Id.*).

**RESPONSE:** The City Defendants do not dispute that Detective Spano summarized an in-person interview with Norfleet on July 11, 2011 in a report dated July 24, 2011. (ECF No. 47-3, 64). The record does not establish when Spano's report was filed. *See* ¶ 30, *supra*.

35. Spano interviewed Ronald Brelove on December 8, 2010, but her written report is dated October 19, 2010, predating the interview by two months. (Plaintiff's Exhibit 3 at 25).

**RESPONSE:** The City Defendants do not dispute that Detective Spano summarized an in-person interview involving herself, Detective Hernandez, and Brelove on December 8, 2010 in a report dated October 19, 2010. (ECF No. 47-3, 64). The record does not establish when Spano's report was filed. *See* Spano Dep., 45:21-46:12. *See also* ¶ 30, *supra*.

36. Spano interviewed Leonard Washington (no relationship to plaintiff) on September 2, 2011, but her written report is dated October 19, 2010. (Plaintiff's Exhibit 3 at 82).

**RESPONSE:** The City Defendants do not dispute that Detective Spano summarized an in-person interview involving herself, Detective Hernandez, and Leonard Washington on September 2, 2011 in a report dated October 19, 2010. (ECF No. 47-3, 82-84). The record does not establish when Spano's report was filed. *See* ¶ 30, *supra*.

37. Spano was unable at her deposition to explain the discrepancies in the dates in her reports. (ECF No. 29-10, Joint Exhibit 10, Spano Dep. 45:23-46:12, 53:6-55:16).

**RESPONSE:** The City Defendants do not dispute that Detective Spano was unsure how the "Reported Date" field was populated in MPD reports at the relevant time, but object to the characterization as "discrepancies." (Spano Dep., 20:18-21:17, 30:5-30:14, 35:14-20, 37:14-39:17, 45:21-46:12, 53:6-55:16).

38. Spano's first documented activity in the case is a report that claims to document a telephone interview she conducted on October 11, 2010 with Detra Love, the daughter of Annette Love. (Plaintiff's Exhibit 3 at 3-5).

**RESPONSE:** Object as a duplication of the parties' JSF No. 31. *See* ECF No. 30, ¶ 31; Civil L. R. 56(b)(2)(B)(ii) ("*additional facts*") (emphasis added). If further answer is required, the City

Defendants do not dispute that Detective Spano wrote a report summarizing a telephone interview that occurred on October 11, 2010, with Annette Love's daughter, Detra Love. (ECF No. 38-2; ECF No. 47-3, 3-5).

39. Detra Love told the police in 1990 that she had heard that a person named Patricia Keys had killed her mother. (Plaintiff's Exhibit 2 at 32).

**RESPONSE:** Object and deny that all the propositions in this paragraph are supported by the materials cited. *See* ECF No. 47-2, 32. As further answer, the City Defendants do not dispute that Detective Ardis wrote a report dated July 17, 1990, wherein Detra told him she heard "some dude named Patrick Keys was responsible" and positively identified Patrick Gordon as someone she had recently seen talking with her mother. *Id.*

40. The police interviewed Keys and verified his alibi. (Plaintiff's Exhibit 2 at 36-37).

**RESPONSE:** Object and deny that all the propositions in this paragraph are supported by the materials cited. *See* ECF No. 47-2, 36-37. As further answer, the City Defendants do not dispute that MPD determined that Gordon was also known as "Patrick Keys," or that he made statements denying involvement in Annette Love's murder and explaining his whereabouts during relevant times, but deny that the cited materials suggest MPD had "verified his alibi" as of that writing. *Id.*

41. Spano wrote in a report dated October 19, 2010 that Detra Love, who was 14 when her mother was killed, had stated over the telephone on October 11, 2010 that she was "positive" that a person named "Smoke" was responsible for her mother's death. (Plaintiff's Exhibit 3 at 5).

**RESPONSE:** Object and deny that all the propositions in this paragraph are supported by the materials cited. *See* ECF No. 47-3, 3-5. As further answer, the City Defendants do not dispute that Defendant Spano interviewed Detra Love by telephone on October 11, 2010 or that the written report summarizing that interview includes the following statement: "Detra indicated that she is positive 'Smoke' and other CVL's are responsible for the death of her mother." *Id.*, 5.

42. Spano wrote in that report that Detra told her that before her mother died, "Smoke" had attacked her cousin Denise Love, biting Denise on the face. (Plaintiff's Exhibit 3 at 5).

**RESPONSE:** Undisputed.

43. Nothing in Spano's report of her conversation with Detra Love identifies "Smoke" beyond his nickname. (Plaintiff's Exhibit 3 at 3-5).

**RESPONSE:** Disputed. At the end of Detective Spano's report is a section stating that "[u]pon review of homicide file M-2292 and M-2294 … the following CVL's were identified:" (ECF No. 47-3, 5). The first entry below that line refers to "Larnell nm Washington … aka SMOKE." *Id.*

44. Spano filed a report on October 19, 2010 purporting to memorialize a telephone conversation she had with Denise Love on October 12, 2010. (Plaintiff's Exhibit 3 at 6-8).

**RESPONSE:** Object and deny that all the propositions in this paragraph are supported by the materials cited. *See* ECF No. 47-3, 6-8; ECF No. 38-2 (the same report). As further answer, the City Defendants deny only that the cited materials establish when the report was filed. *See* ¶ 30, *supra*.

45. Spano wrote in her report on October 19, 2010 that Denise Love confirmed the biting incident related by Detra Love. (Plaintiff's Exhibit 3 at 7).

**RESPONSE:** Object and deny that all the propositions in this paragraph are supported by the materials cited. *See* ECF No. 47-3, 6-8; ECF No. 38-2 (the same report). As further answer, the City Defendants admit that Denise's account of the biting incident memorialized in Detective Spano's report is consistent with Detra's account but deny that "Spano … wrote … that Denise Love confirmed the biting incident." *Id.*

46. Spano wrote a report dated July 24, 2011, purporting to memorialize a conversation with Denise Love five months before on February 11, 2011 in which Denise Love viewed photographs. (Plaintiff's Exhibit 3 at 55).

**RESPONSE:** Undisputed. *See also* ECF No. 30, ¶ 37; ECF No. 38-9 (the same report).

47. There is no identification in the aforementioned report that Spano asked Denise Love to confirm the biting incident in person or to sign a written statement. (Plaintiff's Exhibit 3 at 55-56).

**RESPONSE:** Undisputed. *See also* ECF No. 38-9 (the same report).

48. Neither Detra Love nor Denise Love was re-interviewed before plaintiff was charged with the murder of Annette Love. (Joint Exhibit 12, Keller Dep. 14:23-15:1, *id.* at 18:15-18 (Keller could not locate Denise Love); Joint Exhibit 9 at 17-21 (prosecutor's statement that "there is an additional witness that is uncooperative and the State has been unable to serve with a subpoena.").

**RESPONSE:** Undisputed.

49. Before the scheduled trial date, the prosecution explained in its "Panorama and Other Acts" motion that the store about the bite "explains why the defendant would carry out an act of revenge against the victim." (Plaintiff's Exhibit 4 at 4).

**RESPONSE:** Object as irrelevant to the legal issues presented at summary judgment; the legal question presented is whether probable cause existed to arrest Plaintiff in February 2023 and to subsequently detain him pending trial until October 2023. Motions filed by the prosecution after the preliminary hearing have no bearing upon whether the facts and circumstances presented in the warrant application or at the preliminary hearing established probable cause. Defendants further object that this exhibit was never produced to Defendants during the discovery phase of this suit.

50. Detective Keller spoke with Detra Love on September 28, 2023 and, in a recorded interview, again on October 3, 2023. (Joint Exhibit 18, ECF No. 29-18; Joint Exhibit 19; Plaintiff's Exhibit 5).

**RESPONSE:** Undisputed.

51. Plaintiff's Exhibit 5, a transcript of Keller's recording of his interview of Detra Love, is not offered as evidence, but tendered only to assist the Court in listening to the audio recording. *United States v. Zambrano*, 841 F.2d 1320, 1337-39 (7th Cir. 1988).

**RESPONSE:** The City Defendants do not dispute Plaintiff's proffered reasons for submitting a transcript of the recording, but object to its acceptance as part of the record in this case.

52. In the recorded interview, Love said that she had not been with Denise when Denise was bitten. (Joint Exhibit 19, Plaintiff's Exhibit 5 at 4:07-4:08).

**RESPONSE:** The City Defendants do not dispute Plaintiff's proffered reasons for submitting a transcript of the recording.

53. Love also told Keller that the detective had never shown her photographs. (Joint Exhibit 19, Plaintiff's Exhibit 5 at 6:38-6:47).

**RESPONSE:** The City Defendants do not dispute that Detra Love made that assertion during the recorded call on October 3, 2023.

54. Keller summarized his conversations with Detra Love, writing that she told him that the 2010 police report was wrong because Brelove had done "the actual biting." (Joint Exhibit 18 at 1).

**RESPONSE:** The City Defendants do not dispute the authenticity of ECF No. 29-18, i.e., Detective Keller's Supplemental Report # 102920037.001, or that the body of that report details multiple inconsistent statements by Detra Love on October 3, 2023 about her knowledge about what happened between her cousin and the CVLs and her mother and the CVLs, respectively, in July 1990.

55. Defendant Spano prepared a police report asserting that she and defendant Hernandez interviewed Willie Jean Hampton on October 18, 2010. (Plaintiff's Exhibit 2 at 11).

**RESPONSE:** Object as a duplication of Defendants' Additional Proposed Findings of Fact ("DPFOF") No. 14 and JSF No. 38. *See* Civil L. R. 56(b)(2)(B)(ii) ("*additional facts*") (emphasis added). *See also* ECF Nos. 30, ¶ 18 and 36, ¶ 14.

56. Spano wrote in her report that Hampton stated that the night of Love's death, plaintiff had run into her apartment with "a lot of blood on his shirt," and with a semi-automatic handgun. (Plaintiff's Exhibit 2 at 12).

**RESPONSE:** Undisputed.

57. The prosecutor later described the statements attributed to Hampton as providing "compelling circumstantial evidence of guilt." (Plaintiff's Exhibit 4 at 6).

**RESPONSE:** Object as irrelevant to the legal issues presented at summary judgment; the legal question presented is whether probable cause existed to arrest Plaintiff in February 2023 and to subsequently detain him pending trial until October 2023. Motions filed by the prosecution after the preliminary hearing have no bearing upon whether the facts and circumstances presented in

the warrant application or at the preliminary hearing established probable cause. Defendants further object that this exhibit was never produced to Defendants during the discovery phase of this suit.

58. Detective Keller interviewed Willie Mae Hampton in a recorded interview on October 4, 2023. (Joint Exhibit 24; Plaintiff's Exhibit 6).

**RESPONSE:** Object and deny that all the propositions in this paragraph are supported by the materials cited. *See* ECF Nos. 29-24 and 47-6. As further answer, the City Defendants do not dispute that Detective Keller interviewed Willie Jean Hampton on October 4, 2023, or that the parties previously stipulated to that fact. *See* Civil L. R. 56(b)(2)(B)(ii) ("*additional facts*") (emphasis added). *See also* ECF Nos. 30, ¶ 22.

59. Hampton told Keller, "What the, they say the detective said, I said it, I did not say that." (Plaintiff's Exhibit 6, 3:48-3:54).

**RESPONSE:** Undisputed.

60. Keller confronted Hampton with Spano's claim that Hampton had said plaintiff "had come home one night with a gun and blood on his shirt." (Plaintiff's Exhibit 6, 3:48-3:54).

**RESPONSE:** Object and deny that all the propositions in this paragraph are supported by the materials cited. *See* ECF No. 47-6, 3. *See also* ECF No. 29-24, 3:48-3:54. As further answer, the City Defendants do not dispute that Detective Keller stated, referring to Spano's original written report from October 2010, that Plaintiff "had come home one night with a gun and blood on his shirt." *See* ECF No. 29-24, 7:02-7:10.

61. Hampton responded: "Ain't no way in hell that happened." (Plaintiff's Exhibit 6 at 7:12-7:13).

**RESPONSE:** The City Defendants do not dispute that the quoted text is a partial recitation of Hampton's response to Detective Keller's statement in paragraph 60, *supra*, but deny that it is necessarily accurate unless complete and affirmatively assert that the complete exchange was as follows:

> HAMPTON: Ain't no way in hell that happened. I'm sorry. Y'all know him. Know that detective. I wouldn't lie on him. Y'all gotta do your job.
>
> KELLER: Yeah.
>
> HAMPTON: But that ain't the statement I gave.

*See* ECF No. 29-24, 7:12-24.

62. Hampton told Keller that she had provided Spano with an alibi for plaintiff' "No, he was with me the whole time. The whole day when she got killed. She was like a friend to me." (Plaintiff's Exhibit 6 at 7:35-7:37).

**RESPONSE:** The City Defendants do not dispute that the quoted text is a partial recitation of Hampton's response to Detective Keller's statement in paragraph 60, *supra*, but deny that Hampton told Keller she provided Spano with an alibi or that the partial recitation is necessarily accurate unless complete and affirmatively assert that the complete exchange was as follows:

> KELLER: Ok. What—do you remember what the statement was that you gave?
>
> HAMPTON: He asked me, did he come in with blood on him? Did he have a shirt? Da da da, this, that. No. No, he was with me the whole time. The whole day when she got killed. She was like a friend to me and if I knew …
>
> KELLER: [unintelligible]
>
> HAMPTON: Yeah. If I knew that he killed that girl or had any involvement in it, you think I wouldn't have told? I ain't going to lie on these detectives and say, here, I gave a statement, and then turn around and say, that didn't happen—that never happened. He asked me, did he come in with blood on him, this that, and the other? And I said, sir, no.

*See* ECF No. 29-24, 7:24-8:10.

63. Hampton reaffirmed at her deposition in this case that plaintiff had been with her when Love was killed. (Plaintiff's Exhibit 19 at 14:22-15:4) and that she never told the detectives that she had seen plaintiff with a bloody shirt. (*Id.*, at 18:14-17).

**RESPONSE:** The City Defendants do not dispute that at her deposition in October 2025 Hampton made statements consistent with the recording conversation between her and Detective Keller in October 2023. As further answer, the City Defendants affirmatively assert that Hampton additionally testified that she was interviewed by two male detectives in 2010, *see* ECF No. 47-

19, 20:16-22, 43:20-46:13; that Brelove was not arrested in conjunction with the shooting at Cadillac Barry's in July 1990, *see id.*, 30:3-7; made inconsistent statements about whether Plaintiff and other CVLs were outside the apartment on the night Love was killed, *see id.*, 35:3-20, 40:2-19, 41:9-16; that others were smoking marijuana but Plaintiff did not smoke marijuana," *see id.*, 37:3-18; and that she was positive that the conversation between her and Detective Keller was not recorded. *See id.*, 65:15-20.

64. Defendants Spano and Hernandez traveled to Seattle, Washington to interview plaintiff on August 14, 2011. (Plaintiff's Exhibit 3 at 66).

**RESPONSE:** Undisputed. *See* ECF No. 38 ("Spano Declaration"), ¶ 25, *et seq.*; ECF No. 38-16.

65. Plaintiff agreed to talk to the officer but, on the advice of his attorney, declined to permit recording their conversation. (Plaintiff's Exhibit 3 at 69).

**RESPONSE:** Object and deny that all the propositions in this paragraph are supported by the materials cited. *See* ECF Nos. 38-16, 2 and 47-3, 69 (the same report). As further answer, the text of the written report does not establish that Plaintiff refused to allow the August 2011 interview to be recorded "on the advice of his attorney," or not. Moreover, that proposition is not relevant to the legal issues presented at summary judgment which are limited to whether probable cause existed to (a) arrest Plaintiff in February 2023 and (b) to subsequently detain him pending trial until October 2023. The City Defendants further affirmatively assert that it is undisputed that Detective Spano and Detective Hernandez were prepared to record the interview and no recording exists because Plaintiff declined.

66. Also on the advice of his attorney, plaintiff sought to answer the officer's questions "yes or no" and to not volunteer information. (Plaintiff's Exhibit 7, 82:25-83:15).

**RESPONSE:** Object and deny that all the propositions in this paragraph are supported by the materials cited. *See* ECF No. 47-7, 83:13-15. As further answer, Plaintiff's deposition testimony ("my questions was just yes or no questions; that was that") does not establish whether he was

following the advice of counsel or not. *See also* ECF No. 47-7, 82:25-83:3 ("I told him you don't got to tell me that, I already know that."). Moreover, that proposition is not relevant to the legal issues presented at summary judgment which are limited to whether probable cause existed to (a) arrest Plaintiff in February 2023 and (b) to subsequently detain him pending trial until October 2023.

67. Spano's report recites that plaintiff denied any sexual or violent contact with Love, stated that he had not seen Love for "two to three weeks or three months" before her death, and when told that his DNA had been found on the victim, repeatedly said that "It would not be," without offering any explanation "as to how his DNA is on the victim." (Plaintiff's Exhibit 3 at 70-74).

**RESPONSE:** The City Defendants do not dispute the factual propositions in this paragraph. *See* ECF Nos. 38-16 and 47-3, 68-74 (the same report). As further answer, the City Defendants affirmatively assert that the written text of Detective Spano's report speaks for itself, deny anything inconsistent with that written text, and deny that a partial recitation is necessarily accurate unless complete. Moreover, the written text of that report contains multiple statements about Plaintiff's contacts with Annette Love prior to her death including that: "he did not know her, but … [later] indicated … he had seen her before and that she dated his son's uncle," *see* ECF No. 38-16, 3; that she was dating [his son's uncle] the last time he saw her, *see id.*; "he was not sure the exact date when he last saw [her], but believed it was about two or three weeks to two to three months [before he went to jail for the Cadillac Barry's shooting]", *see id.*; "[h]e was positive he never saw her during the month of July of 1990[,]" *see id.*; "[h]e denied any confrontation with Annette Love regarding his treatment of her niece or daughter and denied that Annette came to the apartment on Palmer and Keefe to confront him[,] *see id*.; "[h]e indicated that he was never inside [A&M Lounge or Ret's Tavern] with Annette Love," *see id*., 4; "he was never romantically involved with Annette Love and indicated that he never had sex with her, did not rape or beat her, and did not see her the whole month of July if not longer and indicated he never saw her at Ret's Lounge ever[,] *see id.*;

and that when confronted with the fact his DNA was found on Annette Love or at the scene "he indicated that he did not believe that and that it would not be because he was not with this victim ever, had absolutely no contact with her the night she died, the month of July and possibly for two months before he went to jail in July 1990." *See id.*

68. Plaintiff, at his deposition, denied telling the police that he had not seen Annette Love the "whole month of July before she was killed." (Plaintiff's Exhibit 7 at 116:4-5).

**RESPONSE:** Undisputed.

69. Plaintiff, at his deposition, also denied telling the police that his DNA would "not be on her at the crime scene" because he had never been with her. (Plaintiff's Exhibit 7 at 116:8-11).

**RESPONSE:** Undisputed.

70. Washington described his relationship with Love as "like family to us." (Plaintiff's Exhibit 7 at 95:5).

**RESPONSE:** The City Defendants do not dispute only that in July 2025 Plaintiff testified that in August 2011 Detective Spano asked whether he knew Annette Love and that he asserts he said that "she's like family to us." *See* ECF No. 47-7, 95:1-5.

71. Washington was not asked at his deposition whether he had killed Annette Love, whether he was present when she was killed, sexually assaulted, or whether he had anything to do with her death. (Washington Affidavit, Plaintiff's Exhibit 8, ¶ 2).

**RESPONSE:** The City Defendants do not dispute the specific factual propositions in this paragraph, but affirmatively assert that the topic of Plaintiff's potential involvement in Annette Love's death as evidenced by DNA was raised (and Plaintiff had the opportunity to explain) in the course of the August 2011 interview. *See* ECF No. 38-16.

72. Washington avers in his affidavit that, if asked, he would have told the officers "No I did not kill Annette Love. I was not present when she was killed. I was not present when she was sexually assaulted. I have nothing to do with her death." (Washington Affidavit, Plaintiff's Exhibit 8, ¶ 3).

**RESPONSE:** The City Defendants do not dispute that Plaintiff so avers now, but deny that his present statement has any bearing on whether there was probable cause to arrest or subsequently detain him, or whether Detective Spano's report contains misattributed statements in so much as he does not aver that he said these things during the August 2011 interview.

73. Plaintiff lived in the same neighborhood as Annette Love, knew her, and would see her two or three times a week. (Washington Affidavit, Plaintiff's Exhibit 8, ¶ 4).

**RESPONSE:** The City Defendants do not dispute that Plaintiff so avers now, but deny that his present statement has any bearing on whether there was probable cause to arrest or subsequently detain him, or whether Detective Spano's report contains misattributed statements in so much as he does not aver that he said these things during the August 2011 interview.

74. Plaintiff and Love would often greet each other with a hug. (Washington Affidavit, Plaintiff's Exhibit 8, ¶ 4).

**RESPONSE:** The City Defendants do not dispute that Plaintiff so avers now, but deny that his present statement has any bearing on whether there was probable cause to arrest or subsequently detain him, or whether Detective Spano's report contains misattributed statements in so much as he does not aver that he said these things during the August 2011 interview.

75. On occasion, people in the neighborhood would gather and smoke weed, sharing the marijuana cigarette by passing it from one person to another. (Washington Affidavit, Plaintiff's Exhibit 8, ¶ 5).

**RESPONSE:** The City Defendants do not dispute that Plaintiff so avers now, but deny that his present statement has any bearing on whether there was probable cause to arrest or subsequently detain him, or whether Detective Spano's report contains misattributed statements in so much as he does not aver that he said these things during the August 2011 interview.

76. Annette Love was part of such a group several times in the 30 days before her death. (Washington Affidavit, Plaintiff's Exhibit 8, ¶ 5).

**RESPONSE:** The City Defendants do not dispute that Plaintiff so avers now, but deny that his present statement has any bearing on whether there was probable cause to arrest or subsequently detain him, or whether Detective Spano's report contains misattributed statements in so much as he does not aver that he said these things during the August 2011 interview.

77. Had the detectives who spoke with plaintiff in Seattle in 2011 asked him if he had touched Annette Love's fingers in the 30 days before her death, he would have told them about the passing weed from one person to another. (Washington Affidavit, Plaintiff's Exhibit 8, ¶ 6).

**RESPONSE:** The City Defendants dispute the specific factual propositions in this paragraph, but affirmatively assert that Detective Spano's written report reflects that Plaintiff was given multiple opportunities to explain the presence of his DNA on Annette Love's body in August 2011. *See* ECF No. 38-16. Moreover, Plaintiff's present averments have no bearing on whether there was probable cause to arrest or subsequently detain him, or whether Detective Spano's report contains misattributed statements in so much as he implicitly denies that he said these things during the August 2011 interview.

78. The physical evidence was reexamined by the crime lab in November 2011, after defendants Spano and Hernandez had obtained a DNA sample from plaintiff. (Plaintiff's Exhibit 9 at 1).

**RESPONSE:** Object as a duplication of DPFOF ¶¶ 38-39. *See* Civil L. R. 56(b)(2)(B)(ii) ("*additional facts*") (emphasis added). *See also* ECF No. 36, ¶¶ 38-39; ECF No. 30, ¶ 46; ECF No. 37-13. As further answer, the City Defendants do not dispute the factual propositions in this paragraph.

79. The crime lab described its analysis "from the swab of the left hand fingernail clippings" as a mixture of DNA from at least two individuals" (Plaintiff's Exhibit 9 at 2) and reported that plaintiff was "a possible contributor to the mixture." *Id.*

**RESPONSE:** Object as a duplication of DPFOF ¶¶ 39. *See* Civil L. R. 56(b)(2)(B)(ii) ("*additional facts*") (emphasis added). *See also* ECF No. 36, ¶¶ 39; ECF No. 30, ¶ 46; ECF No. 37-13. As further answer, the City Defendants do not dispute the factual propositions in this paragraph.

80. The crime lab also stated in its November 18, 2011 report that plaintiff's DNA was not present in the hair found in Love's left hand (Plaintiff's Exhibit 9 at 1) or on her pants, shirt, and belt. (*Id.* at 2).

**RESPONSE:** Undisputed.

81. The crime lab re-examined the vaginal swab in March 2021 and concluded that there is "very strong support for inclusion" of Ronald Brelove. (Plaintiff's Exhibit 10 at 2-3).

**RESPONSE:** The City Defendants do not dispute the factual propositions in this paragraph, but deny this evidence has any bearing on whether there was probable cause to arrest or subsequently detain Plaintiff as a Party to the Crime of Reckless Homicide, or whether Detective Spano's reports contain misattributed statements. *See also* Defendants' Response to ¶ 90 herein.

82. The crime lab again examined the fingernail scrapings in 2022.

**RESPONSE:** Object as a duplication of the parties' Joint Statement of Undisputed Facts ("JSF") Nos. 17 and 18. *See* ECF No. 30, ¶ 1; Civil L. R. 56(b)(2)(B)(ii) ("*additional facts*") (emphasis added). As further response, the City Defendants do not dispute that physical evidence was submitted for re-testing in April 2021 and that the state crime lab issued a report in July 2022. *See* ECF No. 30 ¶ 17-18.

83. The lab subjected the fingernail scrapings to "fingernail washing" and produced a sample DNA which it designated "J2." (ECF No. 29-33 at 1).

**RESPONSE:** The City Defendants do not dispute the factual propositions in this paragraph, but deny this evidence has any bearing on whether there was probable cause to arrest Plaintiff as a Party to the Crime of Reckless Homicide or subsequently detain him pending trial, or whether Detective Spano's reports contain misattributed statements. As further answer, to the extent that Plaintiff did not offer this evidence or testimony challenging the DNA evidence at the preliminary

hearing it has no bearing on whether the evidence that ***was*** presented at that time did or did not establish probable cause to detain Plaintiff pending trial. *See* ECF No. 29-8.

84. Nothing in the report explains the meaning of "fingernail washing" or "sub-designated" (ECF No. 29-33) or refers to direct or scientific evidence to explain how plaintiff's DNA had migrated to the victim's left hand.

**RESPONSE:** The City Defendants do not dispute the factual propositions in this paragraph, but deny this evidence has any bearing on whether there was probable cause to arrest Plaintiff as a Party to the Crime of Reckless Homicide and subsequently detain him pending trial, or whether Detective Spano's reports contain misattributed statements. As further answer, to the extent that Plaintiff did not offer this evidence or testimony challenging the DNA evidence at the preliminary hearing it has no bearing on whether the evidence that ***was*** presented at that time did or did not establish probable cause to detain Plaintiff pending trial. *See* ECF No. 29-8.

85. The crime lab abandoned its previous finding that the DNA extracted from the fingernail scrapings was "from at least two individuals" (Plaintiff's Exhibit 9 at 2) to an assumption of a "two-person mixture." (ECF No. 29-33 at 2).

**RESPONSE:** The City Defendants affirmatively assert that the text of the July 2022 lab report speaks for itself and deny anything beyond that text, including characterizations thereof (e.g., "abandoned its previous finding"). As further answer, the City Defendants object and deny that this evidence has any bearing on whether there was probable cause to arrest Plaintiff as a Party to the Crime of Reckless Homicide and subsequently detain him pending trial, or whether Detective Spano's reports contain misattributed statements. As further answer, to the extent that Plaintiff did not offer this evidence or testimony challenging the DNA evidence at the preliminary hearing it has no bearing on whether the evidence that ***was*** presented at that time did or did not establish probable cause to detain Plaintiff pending trial. *See* ECF No. 29-8.

86. Using the newly processed sample, the crime lab concluded that "It is at least 291 million times more likely to observe this DNA profile if it is a mixture resulting from $H_1$ than if it

is a mixture resulting from $H_2$." (ECF No. 29-33 at 2). The report defined $H_1$ as Love and plaintiff, and $H_2$ as Love and an unknown person. (*Id.*).

**RESPONSE:** Undisputed.

87. Between March 30, 1990 and July 20, 1990, Ronald Brelove committed at least six sexual assaults. (Plaintiff's Exhibit 12, *State v. Brelove*, 514 N.W.2d 879 (1994) (table)).

**RESPONSE:** The City Defendants do not dispute the factual propositions in this paragraph, but deny this evidence has any bearing on whether there was probable cause to arrest or subsequently detain Plaintiff as a Party to the Crime of Reckless Homicide, or whether Detective Spano's reports contain misattributed statements. *See also* Defendants' Response to ¶ 90 herein. As further answer, to the extent that Plaintiff did not offer this evidence at the preliminary hearing it has no bearing on whether the evidence presented at that time did or did not establish probable cause to detain Plaintiff pending trial. *See* ECF No. 29-8.

88. Brelove was charged in a 42-count complaint, which detailed the facts of his offense and shows that he committed sexual assaults in a similar pattern: Brelove would act alone and at night, isolating the victim in a secluded spot, such as an alley or a cemetery, and exhibiting increasing violence, shooting one victim in the face on July 12, 1990. (Plaintiff's Exhibit 11).

**RESPONSE:** The City Defendants do not dispute the factual propositions in this paragraph, but deny this evidence has any bearing on whether there was probable cause to arrest or subsequently detain Plaintiff as a Party to the Crime of Reckless Homicide, or whether Detective Spano's reports contain misattributed statements. *See also* Defendants' Response to ¶ 90 herein. As further answer, to the extent that Plaintiff did not offer this evidence at the preliminary hearing it has no bearing on whether the evidence presented at that time did or did not establish probable cause to detain Plaintiff pending trial. *See* ECF No. 29-8.

89. Brelove's conviction of six assaults and sentence of 438 years was affirmed on February 22, 1994. (Plaintiff's Exhibit 12, *State v. Brelove*, 514 N.W.2d 879 (1994) (table)).

**RESPONSE:** The City Defendants do not dispute the factual propositions in this paragraph, but deny this evidence has any bearing on whether there was probable cause to arrest or subsequently detain Plaintiff as a Party to the Crime of Reckless Homicide, or whether Detective Spano's reports contain misattributed statements. *See also* Defendants' Response to ¶ 90 herein. As further answer, to the extent that Plaintiff did not offer this evidence at the preliminary hearing it has no bearing on whether the evidence presented at that time did or did not establish probable cause to detain Plaintiff pending trial. *See* ECF No. 29-8.

90. Plaintiff was charged with "first degree reckless homicide" in a criminal complaint. (Joint Exhibit 2, ECF No. 29-2).

**RESPONSE:** The City Defendants affirmatively assert that the criminal complaint speaks for itself and object that the factual proposition in this paragraph is materially misleading. The complaint identifies the charge as: "Count 1: FIRST DEGREE RECKLESS HOMICIDE – PTAC, AS A PARTY TO A CRIME, USE OF DANGEROUS WEAPON." *See* ECF No. 29-2, 1. Moreover, the complaint refers to "CO-ACTOR BRELOVE" multiple times. *See id.*, 5-6. The complaint further expressly states the prosecution theory that "Defendant WASHINGTON, having motive to kill [Annette Love], supports a reasonable inference that he in fact shot and killed her **or was a party to the crime, actively aiding and abetting or directing another to shoot and kill her**." *See id.*, 7 (emphasis added). *See also* ECF No. 36 ¶¶ 61-62.

91. In 2017, the Seventh Circuit reinstated a jury's verdict finding that the City of Milwaukee had, between October 2003 and March 2005, "a policy, practice or custom of inadequately investigating homicides." (Joint Exhibit 29-34 at 5, *Avery v. City of Milwaukee*, 847 F.3d 433 (7th Cir. 2017)).

**RESPONSE:** The City Defendants do not dispute the factual proposition in this paragraph. However, this evidence has limited probative value here insomuch as Plaintiff complains about misconduct that allegedly occurred in 2010-2012. The *Avery* decision could not have provided notice of the need to correct inadequate policies before it was issued. Furthermore, the specific

inadequacy identified in that decision—that is, the failure to include potentially exculpatory information about the circumstances under which inculpatory statements were made relevant for impeachment purposes—or factually distinct from Plaintiff's allegation in this suit that inculpatory statements were themselves "made up." *See* ECF No. 1.

92. Defendant Hernandez is one of the officers that the jury found had "fabricated evidence that was a cause of the homicide conviction of William Avery." (JE 29-34 at 2).

**RESPONSE:** The City Defendants do not dispute that in 2015 a civil jury found that Defendant Hernandez "conspire[d] to use fabricated evidence was a cause of the homicide conviction of William Avery." *See* ECF No. 29-34, 2. However, this evidence has limited probative value here insomuch as Plaintiff alleges that reports authored by Detective Spano, not Detective Hernandez, contain complete fabrications and not that they omitted exculpatory information about the circumstances under which the witness made those statements as in the *Avery* case.

93. Defendant Spano in *Avery* "omitted facts about the interrogation that could have been used for impeachment purposes," *Avery v. City of Milwaukee*, 847 F.3d 343, 436-37 (7th Cir. 2017).

**RESPONSE:** Object and deny that all the propositions in this paragraph are supported by the materials cited. *See Avery v. City of Milwaukee*, 847 F.3d 433, 436-37 (7th Cir. 2017). As further answer, the City Defendants dispute and affirmatively assert that in 2015 a civil jury found that Defendant Spano **did not** "conspire to use fabricated evidence was a cause of the homicide conviction of William Avery." *See* ECF No. 29-34, 2. Moreover, the relevant text of that decision (i.e., "The detectives prepared reports to that effect but omitted facts about the interrogation that could have been used for impeachment purposes[,]) does not establish who wrote the report. *Avery*, 847 F.3d at 436. Finally, whether Detective Spano engaged in misconduct was not at issue in the appeal before the Seventh Circuit and the quoted portion of that decision was not the Court's holding.

94. The *Avery* verdict and the decision of the Seventh Circuit placed defendant City of Milwaukee on notice of the need to change its procedures for investigating homicides.

**RESPONSE:** Object as irrelevant to the legal issues presented at summary judgment; the decision in *Avery v. City of Milwaukee*, 847 F.3d 343 (7th Cir. 2017) could not have provided notice at any time relevant to this lawsuit because Defendants Spano and Hernandez's challenged conduct occurred between 2009-2012 and the Seventh Circuit's decision was not issued until several years later. (DPFOF, ¶ 1).

95. National standards for cold-case investigations require re-interviewing witnesses and corroborating decades-old statements before relying on those statement[s] for a prosecution, as well as preserving contemporaneous notes, as set out in the expert opinions of Joe D. Kennedy, a law enforcement practices expert. (Plaintiff's Exhibit 15, Expert Opinion of Joe D. Kennedy).

**RESPONSE:** Object as irrelevant to the legal issues presented at summary judgment; Plaintiff made a strategic decision to name former detectives Spano and Hernandez, but not Detective Keller who initiated the prosecution against Plaintiff, as Defendants. Whether Keller met or exceeded national standards, and/or whether such purported standards define the constitutional standard have no bearing upon Defendant Spano or Defendant Hernandez's liability to Plaintiff. Moreover, to establish municipal liability Plaintiff must establish the existence of an underlying constitutional violation and show that City policy caused that violation.

96. The prosecutor reviewed Keller's investigation and acknowledged to the trial judge on October 6, 2023 that the prosecution could not "prove the case beyond a reasonable doubt." (Joint Exhibit 9, ECF No. 29-9 at 4:10).

**RESPONSE:** Object as irrelevant to the legal issues presented at summary judgment; the legal questions presented are whether probable cause existed to arrest Plaintiff in February 2023 and to subsequently detain him pending trial until October 2023 and/or whether Detective Spano misattributed statements in written reports prepared in 2010-2011. Strategic decisions made by the prosecutor in the criminal case have no have no bearing upon whether the facts and circumstances

presented in the warrant application or at the preliminary hearing established probable cause. Moreover, the City Defendants burden is to establish the existence of probable cause—not to establish Plaintiff's guilty beyond a reasonable doubt.

97. DNA can be transferred from one person to another in numerous ways, including through physical touch and the exchange or transfer of saliva. (Plaintiff's Exhibit 15, Francesco Sesso et al. *Indirect DNA Transfer and Forensic Implications: A Literature Review*, 14 *Genes* 2153 (2023)).

**RESPONSE:** Object as irrelevant to the legal issues presented at summary judgment; the legal questions presented are whether probable cause existed to arrest Plaintiff in February 2023 and to subsequently detain him pending trial until October 2023 and/or whether Detective Spano misattributed statements in written reports prepared in 2010-2011. To the extent that Plaintiff did not challenge the DNA evidence at the preliminary hearing this evidence has no bearing on the outcome of this civil suit.

98. In an email dated September 15, 2023, the prosecutor in plaintiff's criminal case represented that the prosecution would not call defendant Hernandez as a witness. (Plaintiff's Exhibit 17, Email, Sara Lewis to Allison M. Ritter).

**RESPONSE:** Object as irrelevant to the legal issues presented at summary judgment; the legal questions presented are whether probable cause existed to arrest Plaintiff in February 2023 and to subsequently detain him pending trial until October 2023 and/or whether Detective Spano misattributed statements in written reports prepared in 2010-2011. Strategic decisions made by the prosecutor in the criminal case have no have no bearing upon whether the facts and circumstances presented in the warrant application or at the preliminary hearing established probable cause. Defendants further object that this exhibit was never produced to Defendants during the discovery phase of this suit.

99. Detective Keller, the final investigator in this case, followed the accepted procedure of the Milwaukee Police Department in accepting as true each of the reports prepared by defendants Spano and Hernandez. (ECF No. 29-12, Keller Deposition at 12:20-24, 18:19-1, 20:9-13).

**RESPONSE:** Undisputed.

Dated and signed at Milwaukee, Wisconsin this 26th day of August, 2026.

EVAN GOYKE
City Attorney

/s/ Clint B. Muche
CLINT B. MUCHE
Assistant City Attorney
State Bar No. 1131629

*Attorneys for Defendants Spano, Hernandez, and City of Milwaukee*

ADDRESS:
800 City Hall
200 East Wells Street
Milwaukee, WI 53202
Telephone: (414) 286-2601
Fax: (414) 286-8550
Email: cmuche@milwaukee.gov